or argument not to exceed 15 minutes per side, Tony Mary, for the appellant, you may proceed. Morning, Your Honor. May it please the Court, my name is Tony Mary. With me at counsel table is my newly admitted associate, Benjamin Mary, and we requested three minutes for rebuttal. Thank you. When the claims administrator in this case, DRMS, denied Jesse Bruton's final appeal, it cited just one reason for its decision, that in its opinion Bruton was not disabled from performing the functions of a sedentary job. In the district court, AUL advanced the second argument, that Bruton had not been compliant with the plan's regular attendance requirement. A claim DRMS raised in its initial review of Bruton's claim, but one that it subsequently abandoned. The record's clear that Bruton was under the care of a variety of physicians and was therefore in compliance with the regular attendance requirement, but the threshold question is whether AUL is permitted to raise the argument. If this case were here on deferential review, the answer to that question would be no. The Court has long held that post hoc arguments are impermissible on deferential review. Whether post hoc arguments are permitted when the Court's review is de novo, however, appears to be unsettled. ERISA's administrative regulations require a staged process. At the initial level, an individual makes an application of a deferential claim, and an insurer can deny the application on whatever basis it finds appropriate. The regulations, however, require that the insurer set forth, in a manner calculated to be understood by the claimant, the specific reason for the denial, number one, the specific plan provision upon which the denial is based, number two, and then number three, an explanation about what the individual can do to cure the deficiency. That winnows the claim down, because the Court has held that once you move to the administrative appeal stage, that the only issue is whether the basis for the initial decision was substantiated. The insurer typically can't bring up a new reason. Let's just assume that the various reasons were sufficiently set forth for purposes of review. We have before us, maybe we could focus on the issue of the regular attendance. I wonder if you would like to address that. I'd be happy to focus on that, Your Honor, without yielding our... I understand your argument. Okay, that's fine. I'm here to talk about what you're interested in talking about. The problem with the regular attendance provision is that AUL has said that my client didn't comply with it, but has never really said why. The regular attendance provision contains three parts. They've never identified which part he allegedly violated. The first part, personally visits a physician as medically required, and a physician is defined as an MD or an osteopath. Notably, in my experience, this is kind of an anti-chiropractor provision. What it seems like they don't want to happen is someone to go to a chiropractor complaining of a bad back and then file a claim based upon just the chiropractor's assessment. How often did your client go to see some physician? In the year in question, I think in the brief, in the 16-month period in question, he saw his primary care physician, Dr. Briones, a dozen or 15 times. He saw her four times in the month of March 2015. Prior to that, before he ever filed a claim, he had had a number of back procedures. He had seen a pain specialist, Dr. Batra, in 2014. So even coming up to before he ever applied for disability, he had been treated by specialists. And then during the year that he had his claim in process, he had seen a, Dr. Briones had referred him to a physical medication and rehabilitation doctor, to a pain management doctor, and to a psychiatrist. Did he average out one a month? No, I think it was more than one a month. And I apologize, I listed it in the brief. I don't have it right in front of me. But the key period of time, he applied for his benefits in January or February of 2015. And during that period of time, in March, for example, he saw Dr. Briones four times. And she noted particularly the progression of his illness during that stage. What do you make of the claim that that wasn't the most appropriate care, because all Dr. Briones did was just up the ante of opioid medications and other doctors suggested that that was not an appropriate form of care? I guess it would go to the second factor. Okay, fine. The most appropriate treatment and care that will maximize his medical improvement. Well, he saw, I'm not sure, Your Honor, which doctor said that that wasn't appropriate. There was a nurse who commented. Dr. Simek suggested. A PM and R doctor, he had suggested an adjustment to the gabapentin because of the problem that Mr. Bruton had in the summer. I saw in his medical notes that he suggested to him that he be weaned off of oxycodone. Okay. And I think part of that reflects the reality that we're living in these days. But the pain management doctor specifically said that he referred Bruton back to Dr. Briones for medication management. And Dr. Batra in 2014 specifically said that he didn't have any objections about the pain. I mean, the rule I would be concerned about is if we're going to say that general practice physicians can't prescribe opiates for people that are disabled, we're going to all of a sudden disqualify a whole lot of people. What are your thoughts on the issues raised by the DRMS here that Mr. Bruton did not avail himself of the aquatic therapy? I think Dr. Briones at some point recommended it. It had been recommended by Emily Nader, the physical therapist, and I think Mr. Bruton said it was too painful perhaps. He also did not get a second lumbar MRI that had been recommended by Dr. Briones. Apparently at the time the pain was beginning to progress, she thought it would be helpful to get the second MRI. I guess to get a sense of what might be happening in that spinal area. So those are two things. And then I guess the third thing is he did see Dr. I don't recall the pain management specialist, but he did not see Dr. I think Weatherford. Mosley was the one, right. He did not see Dr. Weatherford who had been recommended by Dr. Brightman. I've seen plans that condition disability benefits on compliance with physicians' recommendations. I've seen plans like that. This plan doesn't say that. One of the problems you run into on a plan like that is the doctor tells you to quit smoking, so where are you then? Missing one doctor's appointment either because you got confused or you couldn't afford it or whatever, it seems like a draconian response offered by an insurance company seeking to deny a client. Did he say he couldn't afford to pay this other doctor? Is that the reason? Well, the record, he was never clear why he missed the one doctor's appointment. And I don't think it matters because he subsequently saw a neurosurgeon before that and two other specialists after that. So once again, if we're going to pick out one missed doctor's appointment, we're going to rule out a whole lot of claims. I think he did say he couldn't afford the MRI. He had had an MRI in January. It showed bulging discs and things like that and some moderate worsening from the 2010 MRI, which we don't have in the record. So we just have to take the reviewer's word for that. But it had gotten worse and Dr. Brionis wanted him to do an MRI in April, five months later, and he just said, I have to pay for it out of my pocket. I don't want to do it. And I think... You sure wouldn't pay for it, right? Well, Mike, that's not in the record either, but I do a lot of health insurance litigation stuff. And my guess is the health insurance company would have said, we're not going to do another MRI in five months. You didn't say that. But no, there's nothing like that in the record. That's just my guess. But anyway, he was under the impression he'd have to pay for it. He didn't want to pay for it, didn't think it was necessary. How does that fit in our analysis? I mean, Dr. Brionis has recommended the second MRI for apparently some medical reason. He can't afford it or chooses not to get it. I guess, how does that fit within the regular attendance requirement that he's receiving the most appropriate treatment and care that will maximize his medical improvement? I mean, the argument I'm guessing we'll hear from your opposing counsel here is that he needed to get that MRI so doctors could evaluate. I think you've got to look at it globally, Your Honor. And my response is, what would the MRI have done? He went to see afterwards a spine doctor. He went to see afterwards a pain medicine doctor. He went afterwards to see a PM and R doctor. He'd gone to physical therapy. Same way with the aquatic therapy. He tried physical therapy and the physical therapist even said, yeah, he can't do this. And it was painful and he didn't... So I guess the way you look at it, you have to look at it globally. Can you speak a little bit about, was it Dr. Russell who says the subjective manifestations of pain don't correspond with the objective evidence of what is wrong? I wonder how that, does that play into the analysis at all in terms, I guess that's more... I think if you take a look at the opinion for the court in Wagner that Judge Kesslidge wrote, he didn't cut the doctor much slack. I mean, he's a professional in-house guy. He thinks that opioids only cause constipation. He doesn't think they have any long-term... I just don't think his opinion can be read as credible at all. Those are other evidence. Dr. Briones, for instance, does she suggest that there's more than just subjective evidence of pain or that the subjective evidence of pain actually corresponds with the findings of the MRI? My time? Okay, thank you. Briones does, based on her observations, but the better evidence on that is Moseley and the PMRI guy, Simic, because they actually physically examined him, did all of these medical tests and maneuvers and so on. So there is plenty of objective evidence that goes along with the MRI to support that he's disabled. How does Mr. Bruton's claim cognitive problems fit into his disability? Is that an issue at all, or we're really just looking at his back? His cognitive stuff is important because of what his job was. He was a computer programmer, and his statements and the statements of his doctors and everything else was when he's on medication, and it doesn't necessarily have to be the opioids, because he got confused on Cymbalta, if there was an exchange that he had with one of the representatives where he had to call her back because he double-dosed on Cymbalta and didn't remember what she'd said. But it's that part of it, and we cited a couple of articles about how back pain alone, and I was struck by the physical therapist remark that he couldn't even sit still for an interview. Do you distinguish that from psychiatric evidence? I think a psychiatrist suggested that he refused to provide input because he didn't think he was disabled, so you're more reliant on the mental strain that's required for the job and not psychiatric issues. Correct, yeah. We've never claimed that he is disabled by depression or anxiety. He's got all of that, although most people that are disabled are also depressed. But no, it's his cognitive thinking because of the back pain and because of the medication. We didn't make much of Dr. Garris' refusal to fill out a form because we didn't think he's mentally disabled either. Could you just take a second before you sit down and address again the aquatic therapy? He chose not to do the therapy, and Dr. Brionis, after I think the physical therapist had suggested it or said check it out because it might be effective, at least noted that he had not... How does that fit in the analysis here in terms of the regular attendance requirement? Well, okay, and once again, your Honor, the issue is, is he disabled? Disabled from doing his own occupation, which is highly intellectual. Aquatic therapy... He didn't want to do it because I think he thought it wouldn't do him any good. I don't know, maybe he just doesn't like the pool, I don't know. But in the big picture of what all the other evidence is, if we're going to disqualify somebody because they passed on aquatic therapy, then that's a boon to the insurance company. Okay. Thank you, your Honor. Good morning, your Honors. May it please the Court, my name is Tina Bangs. I'm an attorney with Ogletree Deacons, and I'm here on behalf of American United Life Insurance Company, which is referred to as AUL in the briefing. To get into some of the issues you just addressed with my opposing counsel, there are really two independent reasons for the claim determination, and both are required. If either one is not established and proven by the preponderance of the evidence by Mr. Bruton, then the claim determination denying benefits was correct, and the District Court's decision should be upheld. Starting with the first one, there's a three-factor test for regular attendance. Your opposing counsel suggested it wasn't at all clear which of the factors you were relying on. Could you articulate which one you don't think Mr. Bruton meets? Yes, your Honor. The regular attendance, what's interesting about that particular requirement, it's also part of the total disability definition. So even though disability is a portion of what's required, regular attendance is also required in order to be eligible for benefits. And as was discussed, there are three component parts to the regular attendance definition. As stated in the initial claim determination letter, the determination was that factor number one, personally visits a physician as medically required according to standard medical practice to effectively manage and treat disability, and number two, receiving the most appropriate treatment to maximize medical improvement. There was a discussion in the initial determination letter that the failure to just obtain that recommended MRI that the primary care physician, Dr. Breons, had indicated was necessary, that affects both one and two, as well as the refusal to obtain the aqua therapy. In addition, number three, the other factor of the regular attendance, receiving care by a physician whose specialty or clinical experience is appropriate for the disability, that factor was discussed in the sense that the primary care physician was monitoring the pain management, which can be appropriate, as Dr. Russell and Dr. Toki both indicated. However, it's standard practice to require a pain contract with a patient that's on opioids, especially when the opioids are being increased, and there's also a standard practice of doing random drug testing to make sure there is compliance with use of those medications. Those factors were set out in that initial claim determination. What is the fact that there wasn't a pain contract? Is that the second one, receiving the most appropriate treatment and care? It could meet that criteria. The focus, though, from Dr. Toki and Dr. Russell was more on the third component of the regular attendance, receiving care by a physician whose specialty or clinical experience is appropriate for that disability. I guess at a high level, Mr. Bruton doesn't know who he's supposed to go to, right? I mean, that's the way the health care system works. You go to a primary care physician, and the primary care physician is supposed to direct you to the appropriate specialty. It seems kind of technical to deem him just because. And he did, except for the Dr. Whetstone or that component of evidence. I mean, he was just following what Dr. Brionis was telling him. And that's a very good point, that he was following what Dr. Brionis was telling him, but he was not following everything, because Dr. Brionis was the one who told him, go get another MRI so we can figure this out. She obviously wasn't comfortable with just what was happening with him. What would the second MRI show that the first one did not? I mean, that's a lot of trouble for somebody to go through and have all that clanging and all that, that you know what goes on. And that's a good point. The problem is we don't know what that second MRI would have shown, because it was never accomplished. What about if she said she needed a third one and a fourth one? You think he should have gone and done that? I'm not a medical doctor, so if the doctor is recommending it according to the planned terms that must be enforced as written, then that type of treatment should have been obtained. And it wasn't just not getting the MRI. It was also not getting the aqua therapy. It was also not doing what Dr. Brionis had recommended. One of those doctors said, well, you could try the aqua therapy again or try it, but the doctor wasn't sure that that was really going to help him, right? The physical therapist was the first one to recommend the aqua therapy. Dr. Brionis, the primary care physician, also questioned why that had not yet been accomplished. And then Dr. Simic had even recommended, if not going out to get physical therapy, to do a home exercise program. So between all of the treating doctors, all of them had recommendations for additional medical treatment that Mr. Bruton chose not to follow. I'm sorry to interrupt, but Mr. Bruton did say he simply didn't have the money, right, to pay for the MRI. It was $1,200, he was having problems with his insurance company, not worked for a while, I guess, and he simply didn't have the money to pay for it. So are we going to rely on his financial inability as a reason for the denial of benefits? It is a tough situation, Your Honors. We have to first start with what the law requires. The law requires enforcement of the plan terms, and the plan terms require that he meet the definition of regular attendance, which requires these types of things to have occurred, because his treating providers had recommended it. It also talks about in the plan that those things have to be done at his cost. There are no exceptions. What happens if a doctor recommends a treatment that costs $20,000, $30,000, and the patient has to bear that cost out of his or her own resources, and does not have it? The plan wins. In this situation, we don't have that, fortunately. We don't have that kind of evidence in the record. And that is correct, but we also don't have a cost factor in terms of the aqua therapy, why he chose not to do that. We do not have any cost factor prohibiting him from seeing Dr. Whetstone, when that was also recommended by the neurologist he saw, as well as his own primary care physician. And that is correct, he did see Dr. Mosley nine months after the relevant period. So that is also the key that we need to look at in this particular case. The relevant question is, did he prove by the preponderance of the evidence that he met both requirements, regular attendance and total disability, as of May of 2015? He did not see Dr. Mosley until February of 2016.  I noticed some provisions that suggest if his disability gets better, he can be weaned off of the benefits. But if there's a gap between short-term and long-term benefits, could he say, reapply at the nine-month mark and start receiving it then? That's a good question. It would depend on whether he had come back to work and had continued to be covered under that particular benefit plan. Some employees will return to work, they will continue to be covered, and then they would be eligible to bring a new claim if their condition worsened. We don't have those facts here because he did not return to work. So under the regular attendance prong, which is part of the total disability provision, we have undisputed facts that he was recommended to get an MRI, did not. He was recommended to do aqua therapy, he did not. He was recommended to wean off of the pain meds and do home exercise, he did not. He was recommended these different things, and he cannot now establish that regular attendance requirement. But in addition, we also have the other factor, the other requirement, the total disability provision. And in looking at the record evidence from all of the treating physicians, putting aside the reviewing physician opinions, we have each of the treating doctors finding issues with whether or not he was totally disabled. First and foremost, the psychiatrist he was seeing, Dr. Garris, disagreed with Dr. Brion's determination that his mental health condition was causing disability. Dr. Garris was the one who said no, he is not disabled for his mental health condition, and Dr. Russell appropriately considered that and indicated he would defer to Dr. Garris opinion since that was the treater for the mental health condition. As far as the other doctors, Dr. Brion's, what's interesting about her opinion, and she's the only one who imposed such restrictions to prohibit him from working from any of the other doctors, in February of 2015, she actually indicated he did have sedentary capacity and he would be able to return to work estimated in May, just three months later. And then without any explanation, without any indication in the records as to why, two months later in April, she all of a sudden indicated he could not function in any capacity, he was homebound, and he would never be able to work again. Did she see him in the meantime between those two? She did, Your Honor, and that's what is interesting. If we look at the exam records from Dr. Brion's, starting from the end of July of 2014 and flowing all the way to the end of April 2015, the medical examinations, her findings, were fairly consistent. She found in almost all of those that he had normal curvature, no spine tenderness, tender paraspinal muscle, no tenderness of the SI joint, straight leg test negative, motor system normal, sensory exam normal, reflexes normal, gait normal. There were only a few instances where some of those factors were found to have become a little bit impaired, a little diminished, but then in the next appointment, that diminishment was no longer there and it was back to being normal. Which physician are you depending upon to show he was not disabled? It's the totality of the records, because we have Dr. Brion's abrupt change of opinion that he couldn't do anything in contrast with her own exam findings. You're basing it upon her. Not just her. We also have the fact that Dr. Brightman, the neurosurgeon, did not impose restrictions saying he was unable to work. We also have Dr. Simic, the physical and medicine physician, who did not impose restrictions on his ability to work. And actually in his exam findings, he found negative musculoskeletal deficiencies, spine negative for tenderness, no sensory issues, no motor weakness, balance and gait intact. And none of those doctors even found that there was cognitive deficiencies affecting the ability to perform his job. And none of those treating doctors imposed restrictions based on medications. So when looking at the totality of the record, which is what the law requires in these types of cases, and especially under a de novo review standard that we're under, those records do not support that he meets that definition of total disability. I was curious, can you talk about... So you readily can see that the district court issued a pretty thorough decision in this case. And I found some Sixth Circuit cases suggesting that clear errors should apply to fact findings of the district court. Not of the plan administrator, but of the district court. But do you think it's pretty standard practice to have de novo review, a complete do-over of what the district court undertook? Yes, Your Honor. Under ERISA, if the arbitrary and capricious standard of review is applied at the district court level, that standard of review must also be applied at the appellate level. But similarly, if the de novo review standard is applied by the district court in an ERISA case, then that's the standard of review that applies at the court of appeals. And we concede that point. The case is clear on that particular point. But given the totality of the record, given the express plan terms that are not ambiguous, this gentleman did not meet the definition for total disability because he was not able to establish both the regular attendance requirement, which it's not enough just to have a certain number of appointments. He must meet all three components of that definition. You're basing that upon the plan language, not a case. That is correct, Your Honor. Given that we're under a de novo review standard, yes, the court has to look at the express terms of the plan. And only if those plan terms are ambiguous, and that's indicated to be if there's more than one reasonable interpretation of those plan terms, would then the court look to see how it would analyze those plan terms. But yes, under the de novo standard, looking at these particular plan terms and comparing that with this particular record evidence to see what the determination is. Can I ask, at the last page of your brief, you suggest remand rather than just award benefits outright. What would be the point of a remand? It seems like we're just looking at the record and making our own determination whether we think, by preponderance of the evidence, this person meets these requirements. Usually you think of remand for procedural reasons, right? That is correct. Maybe remand, it's hard to envision when a remand would be appropriate in a de novo case other than after that own occupation period, transitioning to any occupation period, since obviously the record evidence wouldn't have yet been developed. But not to rule that out, that a remand might be appropriate. Thank you, Your Honor. I'm going to try to respond to a bunch of things really fast. First on the issue of remand, the Javeri court said that unless you think you need more evidence, it wouldn't be appropriate in de novo review. It's for us to decide one way or the other. It's here for you to decide. You can't kick it back to anybody. A couple things. Briones did not say that in February of 2015 that Jesse Bruton could return to his own occupation. She said he could work at a sedentary job for one hour at a time. There's a big difference between the two. Secondly, why she got to the fact that he couldn't even do that is documented in the record that his condition progressed materially. As far as the regular care issue, my friend reminded me that the issue is preponderance of the evidence. So I think we have to look at all of the evidence. If we're going to permit an insurer to pick one thing that a claimant didn't do, and that justifies denying the claim, we lose all the time. In fact, in this case, we know that Jesse Bruton had an MRI in 2010. It's not in the record, but we know he had one. He had one in 2010. He had one in 2015. He saw Dr. Batra in 2014, six months before he filed a claim. So it won't do to say, well, yeah, he saw this guy nine months afterwards. He saw him before. So if you look at the preponderance of the evidence, he saw all these specialists. He took all this medication. He did do physical therapy. He had two MRIs. You can always find one thing that a claimant didn't do. Finally, on the point you raised, Judge Murphy, about reviewing the district court's decision, there are a couple of Sixth Circuit cases that suggest that you review findings of fact, but if you track them back, they go back to where there was actually a bench trial. There's no reason in this case. I think this court probably can read a dry record actually better than the district court can. I can do a bunch. This is just a very atypical procedure compared to normal civil cases, and I'm just curious how that developed. You're not allowed to present new evidence in the district court. You don't really follow the federal rules of civil procedure, apparently. It's almost like administrative agency proceedings, but there's no federal administrative agency. Thank you for the question. I'll respond briefly. Judge Cole would know part of the answer to this, because he was in the majority on a case, the Wilkins case. He wrote the majority opinion, but it was a concurrence that set up this whole structure and decided we're not going to be under Rule 52, we're not going to be under Rule 56. It is unique in the circuits, although I will also say every circuit has its own problems with this, because, for example, I think the Second Circuit goes under Rule 56. They construe the evidence in favor of the non-movement. You have two moving parties. You construe the evidence against one and construe the evidence against the other, and I don't know how you sort it out. Maybe at an appropriate time we ought to have a big brief and talk about the procedure. Although I will say it has the benefit of it works. It's efficient. Would I like to be able to bring in new evidence in the district court? Yes, sometimes I sure would, especially if the client comes to me after she's handled her appeal all by herself. There I am stuck with whatever record there is. You're bound by whatever comes up here. Oh, absolutely, absolutely, and right now Wilkins governs, so thank you, Your Honor. Okay, thank you, Mr. Mary and Ms. Baines. Welcome to the bar, Mr. Mary. Appreciate your arguments today. The case will be taken under submission, and you may call the next case.